UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BILL T SWEET, et al.,<br><br>Petitioners,<br><br>v.<br><br>MARYANNE HINZMAN, et al.,<br><br>Respondents. | CASE NO. C08-844JLR<br><br>FINDINGS OF FACT &<br>CONCLUSIONS OF LAW |

This matter comes before the court on an evidentiary hearing on Bill T Sweet, Carolyn Lubenau, Sharon Frelinger, Marilee Mai, Vyonda Rose, Lois Sweet Dorman, Linda Sweet Baxter, Ben Sweet and Charles "Chuck" Willoughby's ("Petitioners") petition for writ of habeas corpus under the Indian Civil Rights Act ("ICRA"), 25 U.S.C. § 1303. Petitioners were represented by Rob Roy Smith and Stephen J. Kennedy of Ater Wynne, LLP. Respondents were represented by Peter T. Connick. At the conclusion of the hearing, the court took the matter under advisement. The court has considered the testimony and evidence introduced at the hearing, the Admitted Facts, the Supplemental

ORDER - 1

Record on file with the court and the argument of counsel. Being fully advised, the court makes its Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. Petitioners were banished and removed from the Snoqualmie tribal membership rolls at a general membership meeting held on April 27, 2008.

2. Respondents Maryanne Hinzman, Arlene Ventura, Margaret Mullen, Katherine M. Barker, Frances De Los Angeles, Robert Hinzman, Nina Repin, Kanium Ventura, Jo-Anne Dominick, Jerry Enick, Nathan "Pat" Barker and Staci Moses were acting as members of the Snoqualmie Indian Tribe's ("Tribe") elected Tribal Council at the time of the April 27, 2008 meeting where Petitioners were banished. Respondents are sued in their official capacities as members of the Tribal Council for alleged unlawful actions.

3. The Tribe is a federally recognized Indian tribe. The Tribe regained federal recognition in October 1999.

4. Petitioners seek relief against Respondents for three violations of ICRA that they allege occurred when Respondents banished Petitioners from the Tribe on April 27, 2008: (1) denial of due process for banishment without adequate formal notice and without an opportunity for a hearing; (2) denial of equal protection for banishment without equal application of the laws; and (3) denial of the right to confront and offer witnesses for banishment without the opportunity to confront opposing witnesses and offer favorable witnesses. Petitioners raise these claims in a petition for a writ of habeas corpus, which was filed in May 2008. Petitioners seek an order setting aside and vacating the

ORDER - 2

banishment, and restoring to Petitioners such rights as they had prior to the initiation of the banishment action on April 8, 2008.

5. There are two types of banishment in the Snoqualmie Tribe: social banishment and full banishment. (Pre-Trial Order (Dkt. # 38), Admitted Facts ¶ 16.) When a person is socially banished that person is temporarily not able to attend tribal functions, including any tribal council or tribal general membership meeting, or come onto tribal property until a fixed date. (*Id.*) Full banishment makes these prohibitions permanent. (*Id.*)

6. On April 8, 2008, the Tribal Council held a meeting at which it socially banished only five Petitioners, Mr. Bill Sweet, Ms. Sharon Frelinger, Ms. Rose, Ms. Lubenau and Ms. Mai, pending a decision on full banishment at a "May membership meeting." (Admitted Facts ¶ 13.) Respondents enacted Resolution Nos. 26-08, 30-08, 31-08, 32-08, 33-08 and 32-2008 socially banishing the five Petitioners. (*Id.*) No date, time, or location was provided in the resolutions for the May meeting. (*Id.*) Respondents and others signed a letter dated April 8, 2008, indicating that a "vote on the recommended banishment by the Snoqualmie Tribal Membership will be held at the May 10, 2008 General Membership meeting." (Admitted Facts ¶ 14.)

7. On April 12, 2008, Respondents held another Tribal Council meeting. (Admitted Facts ¶ 19.) At this meeting it was indicated that "there's going to be a special meeting to consider discipline on April 26th" and Tribal Administrator Matt Mattson suggested that the April 8, 2008 resolutions of discipline be "changed" in order "to tell [Petitioners] that

ORDER - 3

they'll be considered at the April 26th meeting." (*Id.*) Mr. Mattson stated: "I think because it[']s in the resolution they would argue that they were not given notice, because it[']s in the resolution that's recommending banishment. You're saying we're going to discuss it in May." Later he said: "you're meeting on the 26th, correct? . . . So all I'm suggesting is you keep the resolutions the same, except we say 'April membership meeting.'" (*Id.*)

8. At the April 12, 2008 Tribal Council meeting, Respondents added four persons (Ms. Sweet Dorman, Ms. Sweet Baxter, Mr. Ben Sweet and Mr. Charles Willoughby) to the list of individuals to be banished, even though after that date, there were repeated references to only "five" persons subject to banishment. (*See* Admitted Facts ¶¶ 20, 46, 47.) On April 12, 2008, Respondents enacted Resolutions of Discipline Nos. 29-2008, 30-2008, 31-2008, 33-2008, 35-2008, 36-2008, 37-2008 and 38-2008 which socially banished all Petitioners, "prohibit[ing] [them] from participating in Tribal Events or being on the premises of Snoqualmie Tribal properties or lands until the Special April membership meeting" without stating the date or location of such meeting. (Admitted Facts ¶ 20.)

9. The Tribal Council drafted a cover letter sometime after April 12, 2008, that was back-dated to April 8, 2008, stating that a "vote on the recommended banishment by the Snoqualmie Tribal Membership will be held at the April 26, 2008 Special Membership meeting in Issaquah, WA." (Admitted Facts ¶ 15.) The "26th" was crossed out and written over with "27" and the initials "MAH." (*Id.*)

ORDER - 4

10.     The Resolutions of Discipline and cover letters were sent to Petitioners by certified mail on April 18, 2008. (Admitted Facts ¶ 22.) This mailing was the first and only time Petitioners were informed by Respondents about the charges in the Resolutions of Discipline or that such Resolutions had been enacted. Petitioners received the Resolutions of Discipline by certified mail between April 19 and April 24, 2008. (*Id.*) Although mailed to the address Respondents had on file, Ms. Sweet Dorman did not receive a Resolution of Discipline because she was in the process of moving at that time and had no access to mail. (*See id.*)

11.     The Resolutions of Discipline and attached cover letters only provided that the meeting would take place in Issaquah, Washington on April 27, 2008. (*See* Admitted Facts ¶¶ 15, 20.) No time for the meeting was listed nor was a location within Issaquah specified. There was no indication in the documents that Petitioners would be allowed to speak at the meeting. Mr. Bill Sweet and Ms. Lubenau testified that the Tribe did not normally hold meetings in Issaquah, so they did not and would not know where the meeting was to be held based on the information supplied to them by Respondents.

12.     Respondents created an agenda dated April 14, 2008, for the April 27, 2008 meeting. (Admitted Facts ¶ 23.) One of the agenda items for discussion was "banishment." (*Id.*) The meeting was to start at 10:00 a.m. at the Hilton Garden Inn in Issaquah, Washington. (*Id.*) The names of those to be banished were not listed. (*Id.*) Petitioners who testified indicated that they did not receive the agenda by mail from Respondents. Ms. Lubenau, however, received a copy of the agenda for the April 27,

ORDER - 5

2008 meeting from tribal member Christie Jacobs who contacted Ms. Lubenau by email on April 15, 2008. (Admitted Facts ¶ 24.) Ms. Mai found out about the agenda through her mother, who received the agenda on or about April 16, 2008. (Admitted Facts ¶ 25.)

13. Respondents issued two other documents discussing the meeting. (*See* Admitted Facts ¶¶ 26, 30.) The first was an undated letter to "Tribal Members" created on or about April 18, 2008, that listed five persons (Mr. Bill Sweet, Ms. Lubenau, Ms. Sharon Frelinger, Ms. Mai and Ms. Rose) as forming a "shadow government." (Admitted Facts ¶ 26.) The letter does not refer to the Resolutions of Discipline against Ms. Sweet Dorman, Ms. Sweet Baxter, Mr. Ben Sweet and Mr. Charles Willoughby; does not provide the location of the meeting; and refers to both an April 26, 2008 and a May 10, 2008 meeting, without indicating at which meeting "banishment" would be discussed. (*Id.*) On April 24, 2008, Respondents posted a three-page document on the Tribe's website titled "Snoqualmie Tribe's Statement To Our Membership And Greater Community," indicating that "the Snoqualmie Tribal Membership will soon consider full banishment and denial of benefits for several of these individuals who are participating in the illegal shadow government." (Admitted Facts ¶ 30.) The names of those to be banished were not listed, nor was the time, date, or location of the meeting. (*Id.*) Neither document indicates that Petitioners would be allowed to speak at the meeting.

14. Despite not being told by Respondents of the location or start time of the April 27, 2008 meeting, Mr. Bill Sweet, Ms. Lubenau, Ms. Sharon Frelinger, Ms. Mai, Ms. Rose, Ms. Sweet Baxter, Ms. Sweet Dorman and Mr. Ben Sweet were physically present

ORDER - 6

outside the Hilton Garden Inn in Issaquah, Washington on April 27, 2008. (Admitted Facts ¶ 31.) Petitioners arrived between 9:00 and 10:00 a.m. (*See* Admitted Facts ¶¶ 32-37.) Mr. Charles Willoughby did not appear outside the meeting location. (Admitted Facts ¶ 38.)

15. Petitioners were not allowed into the hotel or meeting. (Admitted Facts ¶ 39.) Petitioners were physically prohibited from entering the hotel at the direction of Respondents, as well as the hotel manager, Tribal security staff and two Issaquah Police officers, who were hired by Respondents to "enforce whether or not the people get in or out" of the meeting. (Admitted Facts ¶¶ 28, 41.) Petitioners were told by the hotel manager to stand on the public sidewalk outside the hotel or in the parking lot of the hotel. (Admitted Facts ¶ 42.) Petitioners did so. (*Id.*)

16. Petitioners did not have the new "ID cards" required for entry into the meeting. (Admitted Facts ¶ 40.)

17. Some Petitioners and their supporters passed out a two-page document to persons entering the meeting providing their chronology of events and concluding: "*BANISHMENTS* and *disenrollments* go too far - if you are not with the Enick faction - you will be next." (Admitted Facts ¶ 39.)

18. Mr. Bill Sweet, Ms. Sweet Dorman and Ms. Lubenau testified that while standing outside the hotel entrance they were ignored by Respondents and other tribal members entering the meeting.

ORDER - 7

19. At some point Tribal member Ray Mullen, wearing a T-shirt stating: "Followers of Chief Enick — Yeah, that's right, the REAL Indians," came out of the meeting banging a drum and stating: "The real Indians need to come in." (Admitted Facts ¶ 43.)

20. The April 27, 2008, meeting where banishment was to be discussed was scheduled to start at 10:00 a.m. (Admitted Facts ¶ 45.) The meeting actually started at approximately 11:25 a.m. (*Id.*) Petitioners could not have known when the meeting actually started because they were not allowed inside the meeting; however, Petitioners knew or should have known from past experience that such meetings often started late.

21. None of the Respondents went outside to invite Petitioners inside to speak at the meeting prior to the time Petitioners left the vicinity of the Hilton Garden Inn. (*See* Admitted Facts ¶ 48.) None of the Respondents went outside to tell Petitioners to wait because they would be called in to speak later.

22. At some point before Ms. Sweet Dorman left, she had a conversation with Michelle Buchanan who is not a tribal member but whose partner, Marvin Kemph, is a tribal member. Ms. Buchanan urged Ms. Sweet Dorman to stay to present her side of the story. Ms. Buchanan did not invite Ms. Sweet Dorman into the meeting and, as a non-member, she did not have the authority to do so.

23. Mr. Kemph testified at the hearing that he spoke with Mr. Bill Sweet before he left and told him that now was his moment to come in and that the general membership wanted to hear his version of the story. Mr. Kemph stated he tried to persuade Mr. Bill

ORDER - 8

Sweet to come into the meeting but that Mr. Bill Sweet refused and said "screw it" and "I'm leaving."

24. The transcript of the meeting reflects that someone named "Michelle," presumably Ms. Buchanan, stated during the meeting: "I just said to Bill Sweet, 'Wait. You've got -- you've finally got this chance to come right up here for five minutes and explain yourselves.' 'Screw that. I'm out of here.'" (Petitioners' Submission of Materials to Expand Record filed December 12, 2008, Transcript of Snoqualmie Tribe Emergency Meeting, April 27, 2008 ("April 27, 2008 Transcript") (Dkt. # 27) at 152:21-25.)

25. At the hearing in this case, Ms. Buchanan testified that when she was outside the meeting she saw Mr. Bill Sweet walking with Mr. Kemph toward the parking lot and that all she heard Mr. Bill Sweet say was that he was going to the International House of Pancakes.

26. The Petitioners who were present outside the hotel all left the hotel area around 1:00 p.m. after standing outside for approximately three and one-half hours. (*See* Admitted Facts ¶ 44.)

27. A decision was made during the meeting to have someone go outside to bring Petitioners in one at a time to speak to the meeting "for five minutes." (Admitted Facts ¶ 48.) Ms. Hinzman instructed "Sub Chief Pat Barker to go out and check the parking lot and the restaurant to see who is out there and we will call them in one by one." (*Id.*) According to the transcript of the hearing Ms. Hinzman also stated: "Now we are going to allow them, if they are out there, to come in and speak. The ones that are going to be

ORDER - 9

banished, they have a right to come in and talk to us one at a time." (April 27, 2008 Transcript at 128:4-7.)

28. Petitioners, who were socially banished, needed to be invited by the Tribal Council to speak.

29. At around 1:15 p.m. Mr. Barker went outside to locate Petitioners but could not find them. (*See* Admitted Facts ¶¶ 48-49.)

30. When Petitioners could not be found, a question was asked at the meeting by an unidentified male speaker: "Should we call them and invite them to come and speak?" (Admitted Facts ¶ 49.) An unidentified female speaker responded: "No." Unidentified "Council Members" also stated: "No." (*Id.*)

## II. CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and subject matter jurisdiction of this action pursuant to ICRA, 25 U.S.C. § 1303.

2. Venue is proper in this district as all or a substantial part of the events or omissions giving rise to the actions complained of herein occurred within this district, Petitioners' liberties are restrained in this district and Respondents are residents within this district. *See* 28 U.S.C. § 1391(b).

3. No testimony was presented by Respondents regarding whether tribal remedies existed to challenge Petitioners' banishment or whether Petitioners exhausted the tribal remedies, if any, that were available when this case was filed. The court therefore determines that Petitioners have exhausted all available tribal remedies.

4. The court previously decided, in its order of September 8, 2008, that tribal sovereign immunity does not shield Respondents, sued in their official capacity for alleged unlawful acts, from Petitioners' ICRA claims and that all necessary parties are before the court. No evidence or testimony has been presented that would require the court to revisit its prior order.

5. Petitioners first argue that the Admitted Facts are sufficient to establish their claims under ICRA for violations of the confrontation clause and equal protection. The court addresses the equal protection claim first.

6. 25 U.S.C. § 1302(8) provides that no Indian tribe in exercising powers of self-government shall "deny to any person within its jurisdiction the equal protection of its laws . . . ." "Although the Indian Civil Rights Act of 1968 [] makes a handful of analogous safeguards [found in the Bill of Rights and Fourteenth Amendment] enforceable in tribal courts the guarantees are not identical and there is a definite trend by tribal courts toward the view that they have leeway in interpreting the ICRA's due process and equal protection clauses and need not follow the U.S. Supreme Court precedents jot-for-jot." *Nevada v. Hicks,* 533 U.S. 353, 384 (2001) (O'Connor, J., concurring) (internal citations and quotation marks omitted).

7. In their pre-hearing brief, Petitioners contend, citing *Green v. City of Tucson*, 340 F.3d 891, 896 (9th Cir. 2003) (a case not involving ICRA), that "Respondents have failed 'essentially a direction that all persons similarly situated should be treated alike.'" (Petitioners' Prehearing Brief (Dkt. # 39) at 38.) They claim that they were banished for

attempting to form a shadow government or allegedly participating in such efforts and thus "equal protection would demand that all persons who were allegedly attempting to 'form a shadow government' or allegedly 'participating' in such efforts must receive similar treatment (*i.e.*, banishment)." (Petitioners' Prehearing Brief at 40.) In support of their argument they rely on (1) a reference to a "discussion of discipline" against an individual named Wes Willoughby who allegedly showed "up to the office" but was not subject to a resolution of discipline or banishment (Admitted Facts ¶ 10); (2) the admitted fact that Michael David Ramirez and Catrina Frelinger were appointed by Mr. Bill Sweet to the alleged "shadow government" operated by Mr. Bill Sweet and that these individuals were not subject to discipline and/or banishment even though resolutions of discipline and banishment were enacted against Ms. Sweet Baxter, Ms. Sweet Dorman, Mr. Ben Sweet and Mr. Charles Willoughby where it was "suspected" that they were not involved in the shadow government (*see* Admitted Facts ¶¶ 3, 10, 18); (3) the admitted fact that after voting had taken place on the banishment of Petitioners during the April 27, 2008 meeting other names were discussed but no banishment action was taken against those individuals (Admitted Facts ¶ 55); and (4) the singling out of Ms. Sweet Baxter for allegedly having cursed during a prayer when Respondents cursed during tribal meetings and were not subject to similar punishments (*see* Admitted Facts ¶¶ 10-11).

8. The court has struggled to understand the legal theory under which Petitioners claim that Respondents violated Petitioners' rights to equal protection. As discussed above, they cite *Green* which involved an equal protection challenge to an Arizona

ORDER - 12

statutory scheme for municipal incorporation. 340 F.3d at 893. *Green* is clearly distinguishable. Additionally, Petitioners contend that because Petitioners' fundamental rights are burdened by the banishment, the court should apply "strict scrutiny," citing *N.A.A.C.P., Los Angeles Branch v. Jones*, 131 F.3d 1317, 1321 (9th Cir. 1997), a case involving a challenge to a statutory scheme requiring each candidate for public office who chose to have a statement included in the local voter pamphlet to reimburse the county for the cost of printing the statement. *N.A.A.C.P.* holds "[w]hen analyzing an Equal Protection claim, heightened scrutiny is applied only when a restriction burdens a suspect class or a fundamental right." *Id.* Here, unlike the two cases cited by Petitioners, no statute or regulation is identified as burdening Petitioners' fundamental rights. Respondents, rather unhelpfully, offer no analysis on this point.

9. The court determines that the situation presented here is most like a claim involving an alleged violation of an individual's right to equal protection due to improper selective prosecution. In those cases, the Ninth Circuit teaches:

> A government entity has discretion in prosecuting its criminal laws, but enforcement is subject to constitutional constraints. To prevail on its claims under the equal protection clause of the Fourteenth Amendment, a plaintiff must demonstrate that enforcement had a discriminatory effect and the police were motivated by a discriminatory purpose. To establish a discriminatory effect, the claimant must show that similarly situated individuals were not prosecuted. To show discriminatory purpose, a plaintiff must establish that the decision-maker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.

*Rosenbaum v. City and County of San Francisco*, 484 F.3d 1142, 1152-53 (9th Cir. 2007)

ORDER - 13

(internal citations and quotation marks omitted). Here, on the facts before it, the court is unable to conclude that Petitioners and the other individuals who were not subject to discipline or banishment, Mr. Wes Willoughby, Mr. Ramirez and Ms. Catrina Frelinger (the "named individuals"), were, in fact, similarly situated. Instead of concrete assertions regarding the similarity of conduct between Petitioners and the named individuals, Petitioners rely on allegations that the named individuals were engaging in the same conduct. There has been no testimony from the named individuals that they were engaged in similar conduct and they were not disciplined. Similarly, there was no testimony or other evidence presented regarding whether Ms. Sweet Baxter, Ms. Sweet Dorman, Mr. Ben Sweet and Mr. Charles Willoughby were or were not engaged in the same conduct as the other Petitioners. Additionally, no deposition testimony or other testimony from Respondents was offered by Petitioners stating why Respondents chose to enact resolutions of discipline and pursue banishment against some but not all of the individuals discussed above. The court is left wondering whether the allegations against the named individuals were investigated and found to be unfounded or whether, under the laws and customs of the Tribe, what the named individuals did was found to be not as severe as the actions of Petitioners. On the scant record presented to the court there is simply not enough to conclude that Petitioners were similarly situated.

10. Even if Petitioners had been able to demonstrate that they were similarly situated to the named individuals, they have not shown that Respondents selected or reaffirmed a

particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.

11. Additionally, the court is wary of wading into these waters because discretion should be left to the Tribal Council to determine, under the laws and customs of the Tribe, who it wishes to place before the general membership for banishment. In allowing this case to go forward the court has sought to strike a careful balance between tribal sovereignty and Petitioners' rights.

12. For the reasons stated above, the court denies Petitioners' equal protection claim.

13. Petitioners next contend that they were denied due process because they were banished without formal notice and an opportunity to be heard. 25 U.S.C. § 1302(8) provides in relevant part that no Indian tribe in exercising powers of self-government shall "deprive any person of liberty or property without due process of law."

14. For Petitioners to prove a claim for denial of procedural due process, Petitioners must show that they did not receive adequate notice or an opportunity to be heard with respect to the April 27, 2008 meeting where they were banished. *Cf. Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (interpreting the United States Constitution). "Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 895 (1961). Instead, "due process is flexible, and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

ORDER - 15

15. The court need not and does not decide exactly what process is required before a member of the Snoqualmie tribe may be banished to determine whether the process that was provided to Petitioners in this case satisfies the requirements of procedural due process.

16. There does not appear to be any dispute among the parties that banishment affects the liberty interests of Petitioners.[1] The court determines that banishment affects the liberty interests of Petitioners.

17. "[D]ue process requires the government to provide notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Jones v. Flowers*, 547 U.S. 220, 226 (2006). The Admitted Facts, as well as additional documentary and testimonial evidence introduced at the hearing, demonstrate that while the notice provided was imperfect, all Petitioners were aware of the April 27, 2008 meeting and that banishment would be discussed at that meeting. Eight of the nine Petitioners were present outside the meeting and Petitioners have presented no evidence that Mr. Charles Willoughby, who was the only Petitioner not present was not aware of the meeting, its time, location or subject matter. Significantly, however, none of the documents that Respondents argue provided notice indicated that Petitioners would have an opportunity to be heard at the April 27, 2008 meeting.

---

[1] In fact, Respondents neglect to address this issue in the prehearing briefing.

ORDER - 16

18. "Due process requires that a party affected by government action be given 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 807-08 (9th Cir. 2002) (quoting *Mathews,* 424 U.S. at 333). The court determines that, during the time Petitioners were present outside the hotel where the meeting was taking place, that they were not allowed into the hotel or the meeting. Some Petitioners and their supporters passed out flyers in support of their position on the banishment proceedings. Petitioners did not have the new "ID cards" required for entry into the meeting. Petitioners were physically prohibited from entering the Hilton Garden Inn at the direction of Respondents, as well as the hotel manager, Tribal security staff and two uniformed police officers. The court concludes that the testimony of Josie Moses that Petitioners came inside the hotel and that she told them to wait so they could speak is not credible. The testimony contradicts the Admitted Facts and other sworn testimony that Petitioners were refused entry into the hotel.

19. The testimony of Mr. Barker is credible in that, based on the fact that Petitioners had been socially banished, Petitioners needed a special invitation from the Tribal Council to be able to attend the meeting and speak. The court concludes that this invitation was not provided by Respondents while Petitioners were present outside the hotel.

20. The testimony of Mr. Bill Sweet and Ms. Sweet Dorman that they were not approached and invited to speak at the meeting by anyone who would have had the authority to allow Petitioners into the meeting is credible. In fact, the testimony indicates

ORDER - 17

that Mr. Bill Sweet and Ms. Sweet Dorman approached certain individuals to attempt, sometimes with success and sometimes without success, to talk to them. The court also determines that Mr. Bill Sweet and Ms. Sweet Dorman were urged to stay and present their stories by individuals not having the authority to invite them into the meeting.

21. At approximately 1:15 p.m. Mr. Barker, at the direction of Respondent Ms. Hinzman, went outside to locate Petitioners and bring them one by one into the meeting but could not find them. Mr. Barker had the authority to invite Petitioners into the meeting.

22. The court determines that: (1) none of the alleged notices at issue in this case informed Petitioners that they would have the opportunity to speak at the April 27, 2008 meeting where banishment was to be discussed; (2) Petitioners were excluded from the April 27, 2008 meeting and hotel property where the meeting was being held; (3) there was no indication that Petitioners would be allowed to speak at the meeting from anyone having the authority to invite them to speak; (4) Petitioners left after coming to the reasonable conclusion, after waiting several hours and being ignored by Respondents entering the meeting, that they would not be provided with an opportunity to be heard; (5) after Petitioners left, an individual with authority to invite them to speak went outside to look for them but could not find them in the parking lot of the hotel; and (6) no effort was thereafter made to locate Petitioners to invite them to speak at the meeting. The court concludes under traditional notions of due process, notice and an opportunity to be heard,

ORDER - 18

that these facts combined demonstrate a denial of Petitioners' right to due process under ICRA.

23. The court refuses Petitioners' invitation to determine whether the charges against them were or were not false as part of their due process claim. Additionally, the court declines Petitioners' request to determine what rules and procedures regarding banishment Respondents either had in place or should have had in place. The court also will not determine whether Respondents followed the rules and procedures they had in place or whether they should have followed certain other rules and procedures. Beyond determining whether or not Petitioners were provided with notice and an opportunity to be heard, the court does not believe it should delve into the inner workings of the banishment process.

24. For the reasons stated above, the court determines that Petitioners' have demonstrated a violation of their right to due process under ICRA.

25. Petitioners next argue that Respondents violated Petitioners' confrontation rights found in 25 U.S.C. §1302(6). 25 U.S.C. § 1302(6) provides that no Indian tribe in exercising powers of self-government shall "deny to any person in a criminal proceeding the right to a speedy and public trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and at his own expense to have the assistance of counsel for his defense."

ORDER - 19

26. Because the court has determined that Petitioners have demonstrated a violation of their right to due process, the court need not address the confrontation clause claim.

27. In their petition, Petitioners also presented various other claims for relief. To the extent Petitioners did not address these claims in their prehearing memorandum or at the hearing itself, the court deems these claims abandoned. The abandoned claims are denied.

28. Having found a violation of Petitioners' rights to due to process under ICRA, the court grants the petition and issues the writ. Petitioners will remain socially banished for ninety (90) days following the date of this order to allow Respondents time to determine whether they wish to pursue full banishment against Petitioners.

29. Petitioners and Respondents shall bear their respective fees and costs.

DATED this 30th day of April, 2009.

JAMES L. ROBART
United States District Judge